762 So.2d 96 (2000)
STATE of Louisiana
v.
Antonio H. COLLOR.
No. 99-KA-0175.
Court of Appeal of Louisiana, Fourth Circuit.
April 26, 2000.
*98 Robert J. Pastor, Robert G. Rivard, New Orleans, LA (Attorneys for Defendant/Appellant, Antonio H. Collor).
Harry F. Connick, District Attorney, Cate L. Bartholomew, Assistant District Attorney of Orleans Parish, New Orleans, LA (Attorneys for Appellee/The State of Louisiana).
(Court composed of Judge MOON LANDRIEU, Judge PATRICIA RIVET MURRAY and Judge JAMES F. McKAY, III).
MURRAY, Judge.
Antonio Collor appeals his conviction for second degree murder claiming that the trial court erred in not suppressing a confession he gave to police officers after arrest, in allowing the jury to take a transcript of the confession into the jury deliberation room, in giving an impermissible charge to the jury, and in accepting the verdict from the jury when one of the jurors was obviously ill. Further, he claims that the guilty verdict is not supported by the evidence.

STATEMENT OF THE CASE:
Defendant Antonio Collor was indicted for the second-degree murder of Dwayne Tipton, a violation of La.Rev.Stat. 14:30.1, and was found guilty as charged by a jury. He was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, with credit for time served.

STATEMENT OF THE FACTS:
Officer Brian Gilmore testified that at about 10 p.m. on May 28, 1996, he and his partner received a call concerning a shooting in the 500 block of Hennessy Street. When he arrived at the scene, he found the victim lying next to a house with an obvious gunshot wound to the chest. A girl was near the victim holding a towel to his chest. The officer asked the girl to leave the area, secured the scene and searched the area for weapons. He found no weapons on or near the victim. Officer Gilmore questioned the victim; however, because of his wounds, the victim could not respond. Officer Gilmore did not question any witnesses on the scene.
Detective Dwight Deal of the NOPD's homicide division testified that he was assigned to investigate the homicide, and learned the identity of several possible eyewitnesses; however, none of the witnesses who were allegedly at the scene would cooperate with the police investigation. Under cross-examination, Detective Deal testified that another witness, who was not at the scene, told him that Antonio had admitted to her that he had killed Dwayne Tipton. Using this information and an anonymous tip received from Crimestoppers, which disclosed Mr. Collor's address, Detective Deal obtained an arrest warrant.
Mr. Collor was arrested on July 11. He was advised of his constitutional rights, and indicated that he wanted to give a statement. The arresting officers transported him to the homicide division where he was subsequently questioned by Detective Deal. Detective Deal testified that prior *99 to questioning Mr. Collor, he again read him his rights, which he waived. Mr. Collor then gave the police a statement. Detective Deal identified the waiver of rights form signed by Mr. Collor signifying that his statement was knowingly and voluntarily given. The detective denied coercing, threatening, beating or promising leniency to Mr. Collor in return for his confession.
The jury heard Mr. Collor's taped confession and followed along with copies of the transcript. Mr. Collor admitted that he killed the victim, but said he did so out of fear. He explained that on May 28, 1996, he was going to see a girlfriend who lived on Hennessey Street, in the Mid-City area. While at the girl's house, "Big" (Mr. Tipton's street name) told Mr. Collor that if he caught him in his neighborhood again he would kill him. Later that evening, Mr. Collor returned to his girlfriend's house to take her to the show, but this time he was armed with a .38 caliber snub nose revolver. When he saw "Big" come out of the alley next to the girlfriend's house, Mr. Collor shot him in the chest. "Big" turned and ran after the first shot, and Mr. Collor chased him and fired four more shots. Mr. Collor said that he and the victim did not exchange any words prior to the shooting, but that "Big" walked out of the alley with his hands in his pockets and looked him in a "funny way," so Mr. Collor shot him. He admitted that he did not see the victim with a weapon. Mr. Collor said that his girlfriend and five other people witnessed the shooting. Although Mr. Collor stated that he threw the murder weapon down next to the victim after he shot him, he admitted to the detectives that the gun had been removed from the scene and hidden. He directed Detective Deal to a house under which the murder weapon was hidden in a tire. A .357 Magnum was also discovered, but Mr. Collor denied knowing that it was in the tire. The man who removed the gun from the scene and hid it died a few days before Mr. Collor was arrested.
Dr. Paul McGarry, a forensic pathologist with the Orleans Parish Coroner's Office, testified that the victim, Dwayne Tipton, died from two gunshot wounds, one to the chest and the other to the back of the neck. During the autopsy, Dr. McGarry recovered two .38 caliber bullets from the victim's body. The victim's blood and urine tested negative for drugs. Examining the victim's wounds, Dr. McGarry determined that the victim's chest wound was inflicted at close range. After sustaining the chest wound, the victim fell on his right side, scraping his face on impact with the ground. Dr. McGarry further testified that judging from the trajectory of the bullet in the back of the victim's neck, the killer stood over the victim after he had fallen, and delivered the second mortal wound.
Officer Kenneth Leary, an expert in the field of ballistics and firearms identification, testified that he examined two guns submitted to him  one, a .357 Magnum revolver and the other, a .38 caliber revolver, as well as five .357 Magnum cartridge cases and two .38 caliber bullets recovered during the autopsy of the victim. He concluded that the .357 Magnum revolver fired the five cartridge cases; however, because of the absence of striations on one of the bullets, and because the second bullet was very deformed, he was unable to connect the .38 bullets to the .38 caliber revolver. However, he could determine that the .38 caliber bullets were not fired from the .357 Magnum revolver.
Mr. Collor took the stand and denied killing the victim. He explained that he and the victim were selling cocaine on May 28, 1996, when Corey Washington approached them. Washington gave the victim some money, and Mr. Collor went to get the cocaine. When he returned, Washington was holding a gun on the victim, and demanded the cocaine. Mr. Collor refused and began to run. Washington began shooting and killed the victim. Some time later, Mr. Collor heard a rumor from the neighborhood that he had been *100 identified as the person who shot "Big." He was preparing to turn himself in to the police approximately 43 days after the murder, when he was arrested. He stated that his confession was not free and voluntary, despite his having signed the rights waiver, because Detective Deal beat the confession out of him. Mr. Collor claimed that x-rays taken after he was incarcerated revealed that he had broken ribs and a broken bone in his hip.[1] He denied leading the police to any guns. Mr. Collor also claimed that he gave a taped statement to police in which he explained that Corey Washington had killed "Big." That tape was destroyed, and Detective Deal forced him to make the second tape on which he confessed. He claims he only confessed to stop the beatings.
Mr. Collor's father, Booker Collor, testified that he called a Detective O'Neal several times to discuss the neighborhood rumors about his son being involved in Dwayne Tipton's murder. Detective O'Neal was supposed to pick the younger Mr. Collor up, but never arrived. Mr. Collor saw Detective O'Neal on the street and told him where to pick up his son. Mr. Collor spoke with Antonio several times after he was arrested, and Antonio told him he had cracked ribs. Mr. Collor claimed that three months after Antonio was arrested, a detective went to Antonio's mother's house and accused her of hiding Antonio.
Detective Deal was recalled by the State. He denied beating Mr. Collor, making two separate tapes of statements, and ever hearing of Corey Washington in connection with this case.

ASSIGNMENT OF ERROR NO. 1:
In this assignment of error, Mr. Collor contends that the arrest warrant was issued without probable cause and, as such, his statement given to police after arrest should have been suppressed as being the fruit of an unlawful arrest.
Probable cause to arrest exists when facts and circumstances within an officer's knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the accused has committed an offense. State v. Scales, 93-2003, p. 6 (La.5/22/95), 655 So.2d 1326, 1331, cert. denied 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996). Probable cause to arrest is not absolute cause, and, therefore, courts must examine the facts and circumstances within the arresting officer's knowledge in light of the experience of reasonable people, not legal technicians. Id.
Louisiana Code of Criminal Procedure art. 202 provides that a warrant of arrest shall be issued when "[t]he person making the complaint executes an affidavit specifying, to his best knowledge and belief, the nature, date, and place of the offense, and the name and surname of the offender if known, and of the person injured if there be any; and [a] magistrate has probable cause to believe that an offense has been committed and that the person against whom the complaint was made committed it." La. Code Crim.Proc. art. 202 A(1) and (2).
In reviewing a denial of a motion to suppress, an appellate court is not limited to the evidence adduced at a suppression hearing, but may consider all pertinent evidence adduced at trial. State v. Green, 94-0887, p. 11 (La.5/22/95), 655 So.2d 272, 280; State v. Hall, 98-0667, p. 11 (La.App. 4 Cir. 12/22/99), 750 So.2d 1105, 1108.
The original arrest warrant and supporting affidavit were introduced into evidence at trial. The warrant was dated July 9, 1996, and signed by a judge of the Orleans Parish Criminal District Court. The affidavit was prepared and signed by Detective *101 Dwight Deal and in pertinent part reads:
The facts and circumstances given to support the issuance of this warrant are: On Tuesday, May 28, 1996 at about 10:15 p.m., Dwayne Tipton and several of his acquaintances including Antonio H. Collor were near the intersection of D'Hemecourt and S. Hennessey Streets when an argument ensued between Tipton and Collor. Collor became irate and retrieved a handgun from the scene and began shooting Tipton, who was not armed. Tipton attempted to flee, but Collor chased him and fired several more shots into his body. Tipton died several hours later at the Medical Center of La. On June 27, 1996 Collor was approached by a person familiar with the shooting and the fact Collor had been named as the perpetrator, and in the a(sic) conversation between the two, Collor admitted he shot and killed Tipton. Collor told this witness he had to "shoot" Tipton, because Tipton threatened his "manhood" by calling him names in the encounter between them on the night of the shooting. The known witness alluded to above was shown a photographic line-up from which she positively identified Collor as the person who told her he killed Tipton...
The facts gleaned from the suppression hearing and the trial which support the affidavit filed by Detective Deal relative to the arrest warrant are as follows: Detective Deal made initial contact with Lakesha Hood (the "witness" referred to in the affidavit) on June 4, 1996. At that time Detective Deal learned that she was a witness to certain facts concerning the murder, specifically that Mr. Collor admitted to her that he killed Dwayne Tipton. On July 2, Detective Deal conducted a photographic line-up with Ms. Hood, who positively identified Antonio Collor as the man who admitted to her that he killed Dwayne Tipton. Based on the information he received from Ms. Hood and a tip from Crimestoppers, which corroborated details supplied by Ms. Hood, including the killer's name and address, Detective Deal obtained a warrant for Antonio Collor's arrest. The arrest occurred on July 11, 1996.
The defense relies on State v. Fisher, 97-1133 (La.9/9/98), 720 So.2d 1179 (La.1998), for the proposition that in addition to the legality of the arrest and the presence of a valid waiver of rights, the court must look at other factors to determine whether a confession is admissible. These factors include passage of time and the degree of police misconduct attendant to the arrest.
In Fisher, the victim died in an alley after being shot. No witnesses came forward, but later that evening unnamed "people in the neighborhood," none of whom had seen the shooting or heard the defendant admit the crime, told the police that the defendant shot the victim. Five months after the murder, the police stopped the car in which the defendant was riding, handcuffed him and put him in the patrol car. While en route to the police station, the officer questioned the defendant, who allegedly stated that he accidentally shot the victim while robbing him. Based upon these facts, the Supreme Court determined that the defendant's statement should have been suppressed because of the officers' improper action of seizing the defendant without a warrant for the sole purpose of questioning him about a murder, based on uncorroborated information received five months earlier.
In this case, unlike Fisher, the information identifying Mr. Collor as the killer was received by the police seven days after the murder, from a named witness, Lakesha Hood, and corroborated by a Crimestoppers call. Moreover, the police conducted a photographic line-up with Ms. Hood on July 2, 1996, to confirm the identity of the person who admitted to her that he was the killer; obtained an arrest warrant on July 9, 1996, and arrested Mr. Collor two days later.
*102 Considering all of the evidence adduced at both the suppression hearing and the trial, the police had probable cause for Mr. Collor's arrest. Therefore, we find no error in the trial court's refusal to suppress his confession.

ASSIGNMENT OF ERROR NO. 2:
In his second assignment of error, Mr. Collar maintains that the State failed to prove him guilty of second degree murder beyond a reasonable doubt in light of the mitigating factors establishing manslaughter. Specifically, he argues that no rational trier of fact could have found that he had the specific intent to kill and that there were no mitigating factors that caused him to act in "sudden passion" or "heat of blood." Alternatively, Mr. Collor claims the jury erred in not concluding that he acted in self-defense.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
Nevertheless, the reviewing court may not disregard its duty to consider whether the evidence is constitutionally sufficient simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. Mussall, supra at 1311. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Id. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Id.
Mr. Collor was convicted of second degree murder which is defined by La.Rev. Stat. 14:30.1 as:
... the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm.
La. R.S. 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Specific intent need not be proven as a fact, but may be inferred from circumstances of the transaction and actions of the defendant. State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526. The courts in this State have held that specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Williams, 383 So.2d 369 (La.1980), cert. den. 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828; State v. Seals, 95-0305, p. 6 (La.11/25/96), 684 So.2d 368, 373, cert. denied 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled or that an average person's blood would have cooled, at the time the offense was committed. La.Rev.Stat. 14:31(1). Thus the presence of "sudden passion" or "heat of blood" distinguishes manslaughter from murder. State v. Lombard, 486 So.2d 106, 110 (La.1986).
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter, but, rather, factors which serve to mitigate the grade of the offense from homicide to manslaughter. Lombard, *103 supra. When the preponderance of the evidence shows that a homicide was committed in "sudden passion" which would have deprived an average person of his self-control and cool reflection, a jury errs in rendering a verdict of second degree murder. State ex rel. Lawrence v. Smith, 571 So.2d 133 (La.1990). Thus, in reviewing defendant's claim that the evidence supports a manslaughter verdict, this Court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. State v. Sanders, 93-0001, p. 18-19 (La.11/30/94), 648 So.2d 1272, 1287, cert. denied 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).
At trial the coroner testified that the victim sustained two bullet wounds, one being an entry wound to the chest, which caused the victim's lung to fill with blood, thereby reducing his air supply. Although the victim was weakened by this first assault, he still was able to turn and run. Mr. Collor confessed that he pursued the victim, firing four more shots. From the trajectory of the bullet that caused the second wound in the back of the neck, the coroner opined that Mr. Collor stood over the victim after he had fallen to the ground, and shot him at almost point blank range. Mr. Collor's confession corroborates the details relative to the manner and number of shots fired. Based upon these facts, it does not appear the jury erred in concluding that Mr. Collor had the specific intent to kill the victim. Further, the facts do not support Mr. Collor's claims of mitigating factors and/or self-defense. Mr. Collor admitted that earlier on the day of the murder, the victim told him not to return to that neighborhood. However, Mr. Collor did return to the neighborhood later that evening to take his girlfriend on a date, and brought with him a .38 caliber hand gun. Mr. Collor admitted that the victim did not speak to him, but that he began firing as soon as he saw the victim give him a "funny look." The jury reasonably could have concluded that Mr. Collor's blood had time to cool between his earlier encounter with the victim and the shooting. As for self-defense, Mr. Collor admitted that he did not see the victim with a weapon, and that the victim ran away from him after the first shot. Mr. Collor followed the victim and shot at him four more times, striking him once in the back of the neck. The evidence does not support Mr. Collor's claim of self-defense.

ASSIGNMENT OF ERROR NO. 3:
In his third assignment, Mr. Collor complains that the trial court violated La.Code Crim.Proc. art. 793[2] by allowing the jury to take the transcription of his confession into the jury room during deliberations. A review of the minute entry and the trial transcript does not indicate that the defense objected to allowing the jury to take the confession transcript into the jury room during deliberations. This failure to contemporaneously object precludes appellate review of this issue. La. Code Crim.Proc. art. 841.
Nevertheless, a review of the trial transcript does not reveal that the judge allowed the members of the jury to take any documents into the jury room during deliberation. Initially, the judge asked the jurors if they intended to take the statements with them, but then instructed the jurors to "pass them all down to the end." The judge then told the jurors to call for any evidence they wished to review once in deliberations. There is nothing in the record *104 to indicate that the jury ever called for the statements.

ASSIGNMENT OF ERROR NO. 4:
In this assignment, Mr. Collor contends the trial judge committed reversible error by giving an Allen or "dynamite" charge to the deadlocked jury in order to coerce a verdict.
The Allen charge originated in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed.2d 528 (1896), where the United States Supreme Court approved a charge to break a jury deadlock and accomplish jury unanimity. However, the Louisiana Supreme Court has banned the use of the Allen charge, and subsequent modifications of it. State v. Nicholson, 315 So.2d 639 (La.1975). While our Supreme Court recognized the authority of a trial court to give further instructions to a jury unable to agree upon a verdict, it found the Allen charge problematic for two reasons. First, the charge emphasizes that the jury has a duty to reach a verdict, implying that the trial judge will not accept a mistrial. Second, when the duty to reach a verdict is coupled with an admonition by the trial judge that those in the minority should rethink their position, there exists an almost overwhelming pressure to conform to the majority's view. State v. Campbell, 606 So.2d 38, 40 (La. App. 4 Cir.1992). Thus if a trial judge gives an Allen charge or any "coercive modification" of same, the trial court will have committed reversible error. Nicholson, supra.
In this case after about one hour of deliberation, the jury returned to the courtroom and advised the judge that they were deadlocked. The following colloquy ensued:
BY THE COURT:
I understand that at this point it's been difficult to get ten to agree on something?
BY A JUROR:
Yes, sir.
BY THE COURT:
It's been just about an hour that you all have been up there. And sometimes jurors, you know, they go over things and sometimes some people on one side can make a point one way or the other and can strike the fancy or the imagination of some people who are on one side or the other. Don't you think that probably if you spent maybe about another half hour or so just talking back and forward that you might be able to get the kind of movement that you really need to come up with a verdict? As I understand it, you all did announce that there was s split where there's only the necessity of maybe convincing two other people to come on your side. That kind of thing. And maybe just a little more discussion, making a couple of other points, for about another half-hour or so that you might be able to come up with a decision. You've been with it this long. I'm saying that there's always a possibility that some people might be able to be convinced. Do you think that the people whothat everybody's so stuck in their position that there won't be any movement at all?
BY A JUROR:
I think everybody's stuck in their position. They're not willing to, you know, change it in any way. Now, we can try the 30 minutes, but I just don't think it'll matter.
BY THE COURT:
Does everyone feel that way, that everybody's just stuck in their position, that there can't be any movement, any convincing some other people on the other side that, no, maybe it looks like this or maybe it looks like that, that kind of thing? Or is there a rereading of some of the instructions that I gave that might assist people in coming to a determination?
(NO RESPONSE)
BY THE COURT:
Can we try for about another half hour?
*105 The jury later returned with a verdict of guilty as charged.
In State v. Campbell, 606 So.2d at 39, this Court considered a modified Allen charge. In Campbell, the trial court instructed the jury that:
... if a substantial majority of your number are in agreement as to a verdict which is proper in this matter, the other Jurors [sic] are seriously to ask themselves again and most thoughtfully whether they do not have a reason to doubt the correctness of a judgment which is not shared by several or most of their fellow jurors. And whether they should reconsider the weight and sufficiency of the evidence or whether or not they should consider their perception of the weight and sufficiency of the evidence or lack of evidence. Remember at all times that no juror is expected to yield a conscientious conviction that he or she may have as to the weight or effect of the evidence. But, remember also, after full deliberations and consideration of the evidence in this case, it is your duty to agree upon a verdict if you can do so without surrendering your conscientious conviction.
Campbell, 606 So.2d at 39.
This Court concluded that the trial court committed reversible error when it charged the jury with this instruction. The charge ordered the jurors in the minority to reconsider their views in light of the majority's position.
In the present case, the trial judge did not tell the jurors holding the minority view to rethink their positions in light of the majority's stance in order to reach a verdict. Rather, he encouraged the jurors to "go over things" again to try to reach a verdict. The judge also did not make any reference to the possibility of a mistrial. We do not find the elements of an impermissible Allen charge present in the charge to the jury. In light of the fact that the jury members had deliberated only one hour when they advised the judge they were deadlocked, and considering the gravity of the offense, the trial judge did not abuse his discretion in requesting that the jury continue their deliberations for another half hour.

ASSIGNMENT OF ERROR NO. 5:
In his final assignment, Mr. Collor argues that the judge erred in forcing the jury to resume its deliberation because one of the jurors was ill.
In his brief, counsel for Mr. Collor admits that there is nothing in the record to support this assertion. He explains that he received information that one of the jurors had bleeding hemorrhoids, and had bled through onto one of the chairs in the jury box. After the trial judge requested that the jurors continue their deliberations, the jurors filed past the chair onto which the fellow juror had bled. Counsel asserts that the jury therefore reached a verdict of guilty because of their concern for a fellow juror.
As pointed out by counsel, the record contains no evidence of such a situation during jury deliberation. Defense trial counsel did not raise this issue in the form of a motion for a mistrial, and there is no evidence that the ailing juror reported the problem to the court.

ERRORS PATENT:
A review for errors patent on the face of the record reveals none.
Accordingly, for the foregoing reasons, Mr. Collor's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Medical records are contained in the record, however, they are for treatment of an ankle injury sustained prior to the murder. There are no records to indicate that x-rays were taken after Mr. Collor's arrest.
[2] La.Code Crim.Proc. art. 793 provides:

A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.