995 So.2d 1230 (2008)
STATE of Louisiana
v.
Craig BRADLEY and Lonnie Smith.
No. 2008-KA-0195.
Court of Appeal of Louisiana, Fourth Circuit.
October 1, 2008.
*1232 Keva Landrum-Johnson, District Attorney, David S. Pipes, Jr., Assistant District Attorney, New Orleans, LA, for State of Louisiana.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, LA, for Lonnie Smith.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, for Craig Bradley.
(Court composed of Judge MAX N. TOBIAS, JR., Judge EDWIN A. LOMBARD, Judge PAUL A. BONIN).
PAUL A. BONIN, Judge.
Defendants, Craig Bradley and Lonnie Smith, were charged by a bill of information with two counts each of armed robbery, violations of La. R.S. 14:64. They were jointly tried before a twelve-person jury. At the conclusion of trial, defendant Bradley was found guilty as charged as to count one and not guilty as to count two. Defendant Smith was found guilty of first degree robbery as to count one and not guilty as to count two.
The trial court sentenced defendant Smith to twenty (20) years at hard labor without benefit of probation, parole or suspension of sentence. Smith was later adjudicated a second-felony habitual offender and the trial court vacated the original sentence and resentenced Smith to twenty (20) years at hard labor without benefit of probation, parole or suspension of sentence. Smith appealed.
The trial court sentenced defendant Bradley to twenty-five (25) years at hard labor without benefit of probation, parole or suspension of sentence. Bradley filed a motion for reconsideration of sentence. The trial court granted the motion and resentenced Bradley to fifteen years at hard labor without benefit of probation, parole or suspension of sentence. Bradley also appealed.

*1233 FACTS
The Tango Bar is located in the French Quarter. New Orleans Police Department Detective Orlando Matthews investigated a robbery that occurred there on the night of March 26, 2004. In the course of his investigation, he learned that a suspect in the robbery, Lonnie Smith, worked at a business called the Black Tie, which was located near the bar. The bar and the business were both owned by Mark Blandford.[1] From this lead, the detective compiled a photographic lineup and presented it to patrons and employees who were present during the armed robbery. Following identification of Smith as a perpetrator, he was arrested.
Randall Adams, an out-of-town tourist, testified that on the night in question he had gone into the Tango Bar and ordered a drink. A male subsequently entered the bar and put a gun over Adams' shoulder. Adams then noticed that a second, shorter man with a gun had entered the bar. That man started screaming at a woman playing video poker, saying he wanted the money out of the poker machines. The female bartender, Jessica Mendoza, told him they did not have keys to the machines because they were privately owned. Adams said he turned and looked the man directly in the face, inches away. After realizing they could not get into the video poker machines the two robbers took money off the bar and removed money from the bar's cash register. One of them then ordered the bar patrons and employees upstairs. The police were called from Adams' cell phone.
During the trial, Adams identified defendant Bradley as the man who first walked up behind him and put the gun over his shoulder. Although Adams gave a brief description of the second, shorter robber, he did not identify defendant Smith in court.
Blandford, the owner, testified that he was called to the Tango Bar following the robbery. When he got to the bar he recognized most of the people there, including the bartender, Jessica Mendoza, another bar employee, Adrienne Noble, and Adrienne's sister. Carl Brown, one of the supervisors at Black Tie, was also there. Blandford said he accompanied Mendoza outside with police to view several suspects. Mendoza did not identify anyone in that first group.
Blandford testified on cross examination that both defendant Smith and defendant Bradley worked for Black Tie and that Carl Brown may have been their supervisor.
Daniel Skehan testified that he went to the Tango Bar on March 26, 2004, at approximately 10:00 p.m., after bartending a silent auction at the Cabildo. He ordered a beer and placed his cell phone and cigarettes on the bar before going back outside to put his bag of work things in his truck. Two men came into the bar right before he left. He came back in the bar, and two seconds later the two men pulled out a gun. They ordered the bartender to give them money. They did not rob any of the patrons, except according to Skehan they took Skehan's cell phone. Then, at gunpoint, the robbers forced everyone in the bar into the back courtyard, and fled. Skehan saw the robbers' faces.
Skehan later was presented with a photo lineup, in which he identified the photo of Lonnie Smith. Skehan said he later identified defendant Bradley in an informal show-up lineup at the Eighth District police station. Skehan testified that he remembered *1234 both men because he pleaded with them to leave his cell phone, which had important telephone numbers of business associates. He identified both defendants in court. Skehan admitted to prior convictions for possession of marijuana within the last several years, attempted distribution of marijuana five (5) years previously, and a firearm conviction over ten (10) years ago. Skehan denied making any deals with the State in exchange for testifying.
Jessica Mendoza, the bartender, testified that the defendants walked into the bar and looked around. The two men approached the bar, and she asked what she could get for them. Defendant Bradley said something she did not understand. He then ordered her to give him the "f money". Mendoza asked if he was kidding. Bradley then pointed a gun at her, told her it was no joke, and again ordered her to give him all the "f money". Mendoza called out for fellow employee Adrienne Noble, who did not say anything. Then another woman, whose son worked at the bar, screamed and told Mendoza to just give Bradley the money from the cash register, which she did. Bradley asked for the poker money, meaning money kept to pay off winners playing the video poker machines. Mendoza told him that what had been in the register was all she had. The two men then herded everybody upstairs. After the robbery, she described the robbers to police. Police took her to a show-up of three individuals on the street that same night, but she positively excluded them as the robbers. Mendoza later identified both defendants in separate photo lineups. She also identified both defendants in court.

ERRORS PATENT AND ASSIGNMENT OF ERROR NO. 3 BRADLEY
A review of the record reveals no patent errors.

ASSIGNMENTS OF ERROR NO. 1BRADLEY AND SMITH
In their first assignments of error, both defendants argue that the trial court erred in not allowing them to cross examine prosecution witness Daniel Skehan concerning a criminal charge then pending against him in another section of Orleans Parish Criminal District Court:
MS. MORRIS:
Q. And do you have an interest in this case, as in did you make Any [sic] deals with the State for testifying hear this morning?
A. No.
Q. Is your date of Birth [sic] July 15th?
A. It's [date deleted].
Q. And so you're the same Daniel Skehan who has an open case in Section "G"?
MS. PARKS:
Objection. She's not allowed to talk about open cases, only convictions.
THE COURT:
And I'll sustain the State's objection. Your [sic] to ignoreyou're to not allow that testimony to influence you in any way. You may proceed with your questioning.
MS. MORRIS:
Okay, your honor.
MR. MEYER:
Judge, I'm going to object to the court's ruling. I think it goes to interest, one of interest, whether or not this witness would want to be pleasing to the people who might be prosecuting him.
THE COURT:

*1235 Thank you Mr. Meyer. Once again, I'll note Defense objection. The Court ruling stands.
The defense is correct that the trial judge clearly erred in constraining the cross-examination of Skehan at the State's request. The State in this Court concedes that the question was not objectionable.
The Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination...." Davis v. Alaska, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed.1940). In addition, La. Const. Art. I, § 16 states, in pertinent part, that "[a]n accused is entitled to confront and cross-examine the witnesses against him."
It is well-settled that "[a] witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct." State v. Burbank, XXXX-XXXX, p. 2 (La.4/23/04), 872 So.2d 1049, 1050, quoting State v. Vale, 95-1230, p. 4 (La.1/26/96), 666 So.2d 1070, 1072. A witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." Vale, 95-1230, p. 4, 666 So.2d at 1072, quoting State v. Brady, 381 So.2d 819, 822 (La. 1980). "The possibility that the prosecution may have leverage over a witness due to that witness'[s] pending criminal charges is recognized as a valid area of cross-examination." Burbank, XXXX-XXXX, p. 2, 872 So.2d at 1050, quoting State v. Rankin, 465 So.2d 679, 681 (La.1985).
La. C.E. art. 607(D)(1) states that a party may attack the credibility of a witness by introducing extrinsic evidence to show the witness's bias or interest, except as otherwise provide by legislation. The trial court presumably relied upon the plain language of La. C.E. art. 609.1 in sustaining the objection, which sets forth the general rule that in a criminal case only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, indictment or a prosecution. However, as noted in Authors' Note 2, La. C.E. art. 609.1, Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law (2007), "[d]enying an accused the right to cross-examine a state's witness as to a pending criminal charge in order to show possible bias may deny him not only his right of cross-examination, but also his constitutional right of confrontation."
Nonetheless the State argues that such error was harmless in view of the considerable other evidence against the defendants. Confrontation errors are subject to the harmless-error analysis, as reiterated by the Louisiana Supreme Court in Burbank, XXXX-XXXX, p. 3, 872 So.2d at 1051.
An error is harmless beyond a reasonable doubt if the verdict was surely unattributable to such error. State v. Robertson, XXXX-XXXX, p. 9 (La.1/16/08), 988 So.2d 166, 172, (citing State v. Johnson, 94-1379, p. 17 (La. 11/27/95), 664 So.2d 94, 102; Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)), rehearing granted in part on other grounds (La.3/14/08); Vale, 96-2953, p. 2 (La.9/19/97), 699 So.2d 876, 877.
The crucial issue insofar as the convictions of these defendants was their identification as the two individuals, at least one of whom was armed with a handgun, who *1236 perpetrated the armed robbery of Jessica Mendoza and the armed robbery of Daniel Skehan. Defendants were charged in count one with the armed robbery of Mendoza and charged in count two with the armed robbery of Skehan. The State presented the testimony of the alleged victims, each of whom had made out-of-court identifications of the two men as the robbers. Mendoza's testimony was in all respects corroborated by all the other witnesses. Skehan's testimony stands alone on the point of his being robbed of his cell phone.
Mendoza was face-to-face with the robbers and directly communicated with them. Bradley demanded money from her, raised a gun and reiterated that he wanted money. Mendoza handed cash to him out of the cash register. Bradley asked for the video poker money, and she informed him that the cash she had given him was all there was.
After positively excluding as the perpetrators other persons on the night of the robbery, Mendoza positively identified both defendants in separate photo lineups and in person in court during the trial. Mendoza's identification of the defendants was very strong and their identification was corroborated by other witnesses.
The cross-examination of Blandford elicited testimony that an on the scene witness, Carl Brown, who knew the defendants and who worked with them for Blandford's company, Black Tie, had recognized them and identified them by name.[2]
The tourist, whose first opportunity after the robbery to identify anyone was at the trial, positively identified Bradley.
The jury acquitted both defendants of robbing Skehan. It may have been that the only evidence of that accusation was Skehan's own testimony, uncorroborated by any one of the many patrons in the bar or by any physical or documentary evidence. It may have been that the jury's reasonable doubt arose from his several convictions.
Had the jury accepted Skehan's uncorroborated testimony and convicted these defendants of robbing him, we would not be able to conclude that the error was harmless. However, for whatever its reason(s), the jury's verdict is an implicit repudiation of Skehan's credibility.[3] Additionally, although the defense was unable to fully and properly explore Skehan's possible bias for the prosecution, he had denied that he had received any prosecutorial consideration for his testimony against the defendants.
Considering all of the facts and circumstances unique to this case, we can only conclude that the guilty verdicts rendered as to both defendants for the robbery of Jessica Mendoza were surely unattributable to the trial court's error in denying defense counsel the right to question Skehan as to whether he had a charge or charges pending against him in another section of court. Therefore, that error was harmless beyond a reasonable doubt.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR NO. 2BRADLEY AND SMITH
In their second assignments of error, both defendants argue that the trial court erred in presenting an "Allen" charge to the dead-locked jury. Since both defendants concede that their respective trial *1237 counsel did not object to the charge, they both argue here that this alleged lapse constituted ineffective assistance of counsel.
"As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted." State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802 (citations omitted). However, where the record is sufficient, the claims may be addressed on appeal. State v. Wessinger, 98-1234, p. 43 (La.5/28/99), 736 So.2d 162, 183. The record is sufficient in this case to resolve the issue of ineffective assistance of counsel with respect to the failure of defense counsel to object to the alleged "Allen" charge.
Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing). In order to prevail, the defendant must show both that: (1) counsel's performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra. Counsel's performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
The trial transcript in the instant case reflects that the jury retired to deliberate at 6:15 p.m. At 8:30 p.m. the jury returned to the courtroom and informed the trial court they were deadlocked. The following colloquy transpired:
THE COURT:
I received a note from the foreperson, Mr. Freibert
MR. FREIBERT:
Yes, sir.
THE COURT:
to the effect that you've apparently reached an impasse in your deliberations.
MR. FREIBERT:
That's correct.
THE COURT:
Ladies and Gentlemen: I first want to commend you for your efforts, and acknowledge the fact that you have obviously worked very, very, very hard on this case. It's late in the evening and it's an incredible burden, but under the responsibility that you're there to deliberate to a legal conclusion in this case. It's obviously a very, very serious case that you obviously are taking very, very seriously.
Ladies and Gentlemen, despite the difficulties that you all have been experiencing, I remain confident that there is no better mechanism for bringing this matter to a conclusion that this jury system by which we live. I don't think you're going to find any more competent jurors, any more capable collection of people who are in a position to tackle this very, very difficult issue. I know you've tried, ladies and gentlemen.

*1238 In an effort, in an effort to break this deadlock, I'm going to re-read to you the instruction regarding the various responsive verdicts available to you in this case, of which there are seven.
An "Allen" charge refers to jury instructions intended to break a deadlocked jury. The term refers to an 1896 decision by the U.S. Supreme Court in Allen v. U.S., 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the court considered additional jury instructions given after the jury had returned from deliberations seeking further instruction. The court summarized the substance of the additional instruction as follows:
[T]hat in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.
Allen v. U.S., 164 U.S. at 501, 17 S.Ct. at 157. The U.S. Supreme Court found no error in the giving of the instructions.
Nevertheless, in Louisiana an "Allen" charge is disfavored for two reasons: (1) the charge emphasizes that the jury has a duty to reach a verdict, implying that the trial judge will not accept a mistrial; and (2) "`when the duty to reach a verdict is coupled with an admonition by the trial judge that those in the minority should rethink their position, there exists an almost overwhelming pressure to conform to the majority's view. (Citation omitted).'" State v. Alvarez, XXXX-XXXX, p. 15 (La.App. 4 Cir. 7/18/01), 792 So.2d 875, 885, quoting State v. Collor, 99-0175 (La.App. 4 Cir. 4/26/00), 762 So.2d 96.
Bradley specifically cites the following sentence of the trial court's additional instruction as meaning that the jury had a duty to reach a verdict: "It's late in the evening and it's an incredible burden, but under the responsibility that you're there to deliberate to a legal conclusion in this case...." However, a jury is under a duty to deliberate to a legal conclusionif it can. At no point in giving the additional instruction did the trial court imply that it would not accept a mistrial or that any jurors in the minority should reconsider their views. The additional instruction did not constitute a prohibited "Allen" charge. Further, the jury was faced with two defendants, each charged with two counts of armed robbery, and it had been deliberating only two hours and fifteen minutes at the time it returned to the courtroom and said it was unable to agree on verdicts. It was not an abuse of discretion for the trial court to require the jury to continue deliberating.
Even assuming the instruction constituted a prohibited "Allen" charge and that both defense counsel were deficient in failing to object thereto, neither defendant has shown that there is a reasonable probability that, but for counsels' deficient performances, the result of the proceeding would have been different. Accordingly, *1239 neither defendant has established a claim of ineffective assistance of counsel.
This assignment of error is without merit.

CONCLUSION
Accordingly, for the aforementioned reasons, the defendants' convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] Blandford was a witness at the trial even though he was not present in the bar at the time of the robbery.
[2] Carl Brown did not testify at trial.
[3] Skehan's testimony about the robbery of Jessica Mendoza was cumulative.