925 So.2d 567 (2006)
STATE of Louisiana
v.
Deszie WILLIAMS.
No. 2005-KA-0459.
Court of Appeal of Louisiana, Fourth Circuit.
January 18, 2006.
Rehearing Denied April 6, 2006.
*568 Eddie J. Jordan, Jr., District Attorney, Yolanda J. King, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge TERRI F. LOVE, Judge LEON A. CANNIZZARO JR., Judge ROLAND L. BELSOME).
TERRI F. LOVE, Judge.
The appellant Deszie Williams was indicted for the second-degree murder of Lamont Mitchell. At his arraignment he pled not guilty. At the conclusion of a two-day trial, a twelve-person jury found him guilty as charged. The court denied the appellant's motion for a new trial. After the appellant waived all delays, the court sentenced him to life imprisonment at hard labor without benefits of parole, probation, or suspension of sentence. The trial court denied the appellant's motion for reconsideration of sentence but granted his motion for appeal. For the reasons stated below, we affirm the judgment of the trial court.

FACTUAL BACKGROUND
At approximately 4:30 p.m. on August 4, 2003, the body of Lamont Mitchell ("Mr. Mitchell") was found in the 1000 block of S. Lopez Street. Major Robert Chehardy ("Maj. Chehardy"), a former N.O.P.D. officer, *569 testified that he was inside his business in the 4200 block of Euphrosine Street when a woman came in the building and told him that someone had just pushed a body out of a car around the corner. Maj. Chehardy walked to the 1000 block of S. Lopez and found the body of a man lying on the sidewalk with his feet in the street. Maj. Chehardy stated that the man had gunshot wounds, including one that damaged the man's left ear, and he was uncertain if the man was still alive at that point. Maj. Chehardy called the police and secured the area until the police arrived.
Detective Armando Asaro ("Det. Asaro") testified that when he arrived on the scene he observed the dead body of a man with two gunshot wounds to the head. Det. Asaro testified that he was able to identify the body as that of Mr. Mitchell by checking the victim's cell phone. Det. Asaro stated that he learned that Mr. Mitchell was a temporary worker at Xavier University. Det. Asaro interviewed one of Mr. Mitchell's co-workers, Wendell Snead ("Mr. Snead"), and later showed him four photographic lineups from which he chose photos of James Bannister ("Mr. Bannister"), James Cardoza ("Mr. Cardoza"), Henry Byrd ("Mr. Byrd"), and Deszie Williams ("Defendant Williams") as those of his co-workers with whom he last saw Mr. Mitchell. Det. Asaro testified that although he arrested all four of these men, only Defendant Williams was formally charged with the murder. Det. Asaro obtained search warrants for Defendant Williams' car and residence and for Mr. Cardoza's residence. Det. Asaro seized nothing from Defendant Williams' residence, but he seized some bloody clothes from Mr. Cardoza's house. Det. Asaro testified that he obtained statements from Mr. Snead and Mr. Bannister, and Mr. Cardoza also cooperated in the investigation. He also indicated he received a Crimestoppers tip, but he did not testify as to its contents. He stated that no one came forward on the day of the shooting with any information concerning the murder.

EXPERT TESTIMONY
Dr. William Newman (Dr. Newman), qualified as an expert in the field of forensic pathology, testified that Mr. Mitchell sustained four gunshot wounds, two to his head and two to his chest, one of which grazed his arm before entering his chest. Dr. Newman stated that several of these wounds would have been fatal by themselves. Because there was no stippling, Dr. Newman reasoned that the shots were fired from more than two and a half feet from the victim. He admitted that the victim's body was wet when he received it because it had lain outside in the rain, but he did not know if the rain would have removed any gunpowder residue. Dr. Newman testified that the gunshot angles indicated the shooter was on the victim's left side and higher than the victim. Dr. Newman further testified that blood samples taken from the victim were negative for alcohol or other commonly abused drugs.
Anna Duggar, qualified as an expert in the fields of serology, crime scene investigation, latent print analysis, hair and fiber analysis, and the collection and analysis of gunshot residue, testified that she is a criminalist for N.O.P.D. She stated that she processed Defendant Williams's car and found possible bloodstains on the passenger side window and the door molding as well as on the front of the driver's side seat. She dusted the exterior of the driver's side but lifted no prints.
Officer Kenneth Leary, Jr., qualified as an expert in firearms examination, testified that he examined the bullets and fragments taken from Mr. Mitchell's body and *570 concluded that all of them had been fired from the same weapon.
Mr. Snead, Mr. Bannister, Mr. Byrd and Mr. Cardoza all worked with Defendant Williams at Labor Ready and were assigned to Xavier University on the date of Mr. Mitchell's shooting. All of the gentlemen testified to the actions leading to Mr. Mitchell's death.

TESTIMONY OF MR. SNEAD
Mr. Snead testified that he was a temporary worker employed by Labor Ready and assigned to Xavier University in August 2003. He testified that at that time he worked with Mr. Bannister, Mr. Cardoza, Mr. Byrd, Mr. Mitchell, and Defendant Williams, and on most days Defendant Williams gave them rides to and from the Labor Ready office on Tulane Avenue to Xavier University. On the afternoon of August 4, 2003, he and Charles Boone ("Mr. Boone"), another worker, elected to walk back to the Labor Ready office and left before Defendant Williams and his passengers, whom he identified as Mr. Bannister, Mr. Cardoza, Mr. Byrd, and Mr. Mitchell. Mr. Snead testified that as he and Mr. Boone approached the Jefferson Davis Bridge over the I-10, Defendant Williams drove up and stopped the car. He testified that Mr. Bannister, Mr. Cardoza, and Mr. Byrd got out of the car, looking dazed, and Mr. Cardoza had blood on his shirt. Mr. Snead stated that after he arrived back at the Labor Ready office, Mr. Cardoza kept pacing and muttering, "he screwed him around bad, real bad." Mr. Snead testified that he did not see Mr. Mitchell or Defendant Williams at the Labor Ready office that afternoon, and he later learned that Mr. Mitchell had been murdered.
Mr. Snead testified that he viewed photographic lineups from which he chose photos of the men he saw get into Defendant Williams' car on the afternoon of the murder. He testified that he did not know Defendant Williams enough to dislike him. Mr. Snead admitted having several prior convictions for offenses including crime against nature, prostitution, and forgery.

TESTIMONY OF MR. BANNISTER
Mr. Bannister testified that on August 4, 2003 he also worked at Xavier University for Labor Ready. He stated that on that date he and the others left work around 4:00 p.m., and he entered Defendant Williams's car with Mr. Cardoza, Mr. Byrd, Mr. Mitchell, and Defendant Williams to ride back to the Labor Ready office to receive their day's wages. He testified that he was seated in the front passenger seat, while Mr. Mitchell was seated behind him and Mr. Bannister and Mr. Cardoza were also seated in the back seat of Defendant Williams' car. He testified that Mr. Mitchell and Defendant Williams usually joked around and had been doing so all day, and he saw no ill will between them up to the point of the shooting. Mr. Bannister testified that Mr. Mitchell was talking on his cell phone, and at some point Defendant Williams stopped the car in the middle of Lopez Street and asked Mr. Mitchell if he had something on his mind. Mr. Bannister testified that Mr. Mitchell did not answer because he was still on the phone. Mr. Bannister stated that Defendant Williams then asked Mr. Mitchell, "You want to get at me?" Defendant Williams then reached under his seat. Mr. Bannister testified that he got out of the car at that point, and as he was walking away he heard gunshots coming from inside the car. He then ran toward the Jefferson Davis Bridge, and when he saw Defendant Williams driving by him he did not see Mr. Mitchell in the car. He also saw Mr. Byrd and Mr. Cardoza walking toward the bridge.
*571 Mr. Bannister stated that he walked across the bridge to a convenience store at the corner of Tulane and Jefferson Davis Avenues where he met Mr. Cardoza and Mr. Byrd. After discussing the matter for approximately forty-five minutes, the men walked back to the Labor Ready office to obtain their wages, and Defendant Williams arrived about fifteen minutes later. Mr. Bannister stated that he rode with Defendant Williams from the Labor Ready office to Xavier University the next day in order to learn what happened after he left Defendant Williams' car the preceding day. Mr. Bannister testified that he was not afraid of Defendant Williams despite the shooting the previous day.
Mr. Bannister admitted he was arrested with Defendant Williams, but he was never charged. He also admitted that he did not contact the police concerning his knowledge of the shooting, but he insisted that he merely wanted to get home to his family. He also testified that he initially told the police that did not see or hear the shooting and that Mr. Mitchell also exited the car. He admitted he saw blood on Mr. Cardoza's shirt when they met after the shooting.

TESTIMONY OF MR. BYRD
Mr. Byrd testified that he also accepted a ride with Defendant Williams from Xavier University to the Labor Ready office on the day of the murder. He testified that he was sitting behind Defendant Williams, with Mr. Cardoza sitting in the middle of the back seat and Mr. Mitchell seated behind Mr. Bannister. He indicated there was some tension in the car that afternoon between Defendant Williams and Mr. Mitchell, and at some point Defendant Williams stopped the car and asked Mr. Mitchell, "You still want to get at me?" Mr. Mitchell was on the phone, but he replied affirmatively and hung up his cell phone. Mr. Byrd testified that Mr. Bannister got out of the car. Defendant Williams also exited the car, and Mr. Byrd thought that Defendant Williams was going to fight Mr. Mitchell. Instead, Defendant Williams started shooting into the car at Mr. Mitchell, who was still in the back seat. Mr. Byrd testified that Defendant Williams then got back into the car and drove to a vacant building on Lopez Street where he got out. Mr. Byrd stated that at that point, he and Mr. Cardoza exited the car and ran toward the Jefferson Davis Bridge. Mr. Byrd testified that they caught up with Mr. Bannister, and the three men crossed the bridge and went to a convenience store on the other side of the bridge and then continued on to the Labor Ready office. Mr. Byrd admitted that he was later arrested in connection with the murder when he turned himself in after learning of the warrant for his arrest. He denied receiving anything in exchange for his testimony, and he denied plotting with Mr. Bannister and Mr. Cardoza to blame the murder on Defendant Williams.

TESTIMONY OF MR. CARDOZA
Mr. Cardoza testified that he also worked at Xavier University on the day of the shooting, and he observed Defendant Williams and Mr. Mitchell arguing during the workday. Mr. Cardoza stated on the ride back to the Labor Ready office at the end of the day, he was seated in the back seat between Mr. Byrd and Mr. Mitchell. He testified that Defendant Williams' car had only two doors. Mr. Cardoza indicated that during the ride, Mr. Mitchell asked Defendant Williams about Defendant Williams having any "Black and Milds," and Defendant Williams replied that he had just smoked one, but he only smoked one a day. After this exchange, Defendant Williams asked Mr. Mitchell if he still wanted to get at him. Mr. Mitchell replied affirmatively, and Defendant Williams *572 stopped the car, got out, and asked Mr. Mitchell the same question. Mr. Cardoza testified that Mr. Mitchell replied, "Yeah, I want to get at you." Defendant Williams then asked the same question a third time and began shooting at Mr. Mitchell. Mr. Cardoza testified he pushed Mr. Byrd out of the way. Mr. Cardoza stated that Mr. Bannister had left the car before the shooting when Mr. Bannister noticed Defendant Williams' gun. Defendant Williams then got back in the car and drove off. Mr. Cardoza testified that Mr. Mitchell fell against him, getting blood on his shirt. Defendant Williams drove to a nearby intersection, where he stopped the car and exited. At that point, Mr. Cardoza and Mr. Byrd got out of the car and ran toward the bridge. Mr. Cardoza testified that he could see Defendant Williams dumping Mr. Mitchell's body out of the car as Mr. Cardoza and Mr. Byrd ran away.
Mr. Cardoza testified that he and Mr. Byrd met up with Mr. Bannister, and they walked across the bridge and eventually to the Labor Ready office. He indicated that he saw Defendant Williams at the Labor Ready office that evening and again the next day. Mr. Cardoza testified that he did not call the police because he was afraid, but he was eventually arrested for the murder. He identified the bloody clothing seized from his residence as what he was wearing on the day of the murder. He denied shooting Mr. Mitchell. He admitted having a prior armed robbery conviction in 1989, and he denied receiving any offers in exchange for his testimony. Mr. Cardoza positively identified Defendant Williams as the man who shot Mr. Mitchell.

ERRORS PATENT
A review of the record reveals there are no patent errors.

RELEASE OF INFORMATION REGARDING PAYMENT BY CRIMESTOPPERS
In his first argument, Defendant Williams contends that the trial court erred by denying his request for the production of information concerning any payments made by Crimestoppers for tips given in connection with this case. In his motion for this disclosure, he asserted that the State admitted prior to trial that Crimestoppers received a tip from one of the other three men in the car just prior to the shooting who implicated him in the murder. He maintained that he needed this information for impeachment purposes to show a financial incentive for that witness' identification of him as the man who shot the victim. The court denied the motion. At trial, defense counsel ascertained from Det. Asaro that the police had received a tip from Crimestoppers concerning the case. After Det. Asaro stated that Crimestoppers offers rewards to tipsters, counsel then asked him if "anyone applied for any money as a result of giving you a tip?" The court sustained the State's objection, noting that it had already ruled that this information could not be divulged.
Defendant Williams now argues that the trial court erred by denying his motion because he could have used this information to impeach the credibility of whichever witness purportedly received a reward from Crimestoppers. In support, he cites La. C.E. art. 514, which provides for the confidentiality of the identity of informants. Subpart C(1) provides: "No privilege [of confidentiality] shall be recognized if: (1) The informer appears as a witness for the government and testifies with respect to matters previously disclosed in confidence." The appellant argues that because the purported Crimestoppers tipster testified at trial, information concerning *573 any financial reward he may have received is no longer privileged.
However, La. R.S. 15:477.1 provides that communications made to "crime stoppers" organizations is privileged. The statute provides in pertinent part:
B. No person shall be required to disclose, by way of testimony or otherwise, a privileged communication between a person who submits a report of alleged criminal activity to a crime stoppers organization and the person who accepts the report on behalf of a crime stoppers organization or to produce, under subpoena, any records, documentary evidence, opinions, or decisions relating to such privileged communication:
(1) In connection with any criminal case or proceeding.
(2) By way of any discovery procedure.
C. Any person arrested or charged with a criminal offense may petition the court for an in camera inspection of the records of a privileged communication concerning such person made to a crime stoppers organization. The petition shall allege facts showing that such records would provide evidence favorable to the defendant and relevant to the issue of guilt or punishment. If the court determines that the person is entitled to all or any part of such records, it may order production and disclosure, as it deems appropriate.
Unlike La. C.E. art. 514, which provides for the general disclosure of an informant's identity under limited circumstances, La. R.S. 15:477.1 specifically addresses the limited disclosure of information concerning confidential tips to "crime stoppers" organizations. In State v. Divers, 38,524, pp. 26-27 (La.App. 2 Cir. 11/23/04), 889 So.2d 335, 354[1], the court recognized this difference:
Generally the identity of an informant is privileged and may be withheld. La. C.E. art. 514(A). The party seeking to overcome the privilege must clearly demonstrate that the interest of the government in preventing disclosure is substantially outweighed by exceptional circumstances such that the informer's testimony is essential to the preparation of the defense or to a fair determination on the issue of guilt or innocence. La. C.E. art. 514(C)(3). To gain disclosure of the identity of an informer, the defendant bears the burden of demonstrating exceptional circumstances pertaining to his defense, and the trial court is accorded great discretion in making such a determination. State v. James, 396 So.2d 1281 (La.1981).
La. R.S. 15:477.1 provides that statements reporting alleged criminal activity to a "crime stoppers organization" are privileged communications not subject to disclosure. However, a criminal defendant may petition the court for an in camera inspection of the records of a privileged communication to determine whether "such records would provide evidence favorable to the defendant and relevant to the issue of guilt or punishment." La. R.S. 15:477.1(C). This test is a broader exception than the one created in La. C.E. art. 514. See Comment (c), La. C.E. art. 514. If the court determines entitlement to all or any part of such records, it may order production and disclosure as it deems appropriate. La. R.S. 15:477.1(C).
The confidentiality requirement of the crime stopper's privilege ensures anonymity *574 for the tipster. Certainly, were tipsters to be revealed or readily made available to the defense, such informants would be discouraged from calling in information.
In Divers, the defense sought the disclosure of the identity of a tipster to Crimestoppers who provided information that someone other than the defendant committed the crime. Defense counsel moved for the disclosure of this person's identity, but the court denied the motion after conducting an in camera inspection of Crimestoppers' records.[2] On review, the court upheld the trial court's ruling, noting that the tipster was not present at the crime and thus could not have presented any reliable information. The court further noted that any possible error was harmless because the codefendant confessed that he and the defendant committed the crime.
In State v. Cager, 97-1877 (La.App. 4 Cir. 3/24/99), 732 So.2d 97, the defendant sought a subpoena duces tecum to Crimestoppers to discover if any payments were made to a State witness and if so, how much money she had received. The defendant insisted that it needed this information to impeach her. The witness apparently admitted later at trial that she had received $500.00, but she testified that she did not expect to receive any further reward. The trial court quashed the subpoena duces tecum, and on review, this court affirmed. This court noted that La. R.S. 15:477.1 prohibits the disclosure of privileged information between a person who reports a crime and the person to whom the crime is reported, and it found that information concerning financial rewards fell within this privilege. This court based its decision on State v. Gibson, 505 So.2d 237 (La.App. 3rd Cir.1987), where the defense sought a subpoena duces tecum to Crimestoppers to see if any payments were made for tips given in connection with the case and if so, how much was given and when it was given. The trial court quashed the subpoena duces tecum, and the Third Circuit court affirmed, stating:
LSA-R.S. 15:477.1(B) is very broad; it covers any records, documentary evidence, opinions or decisions in any criminal case or proceeding, by way of any discovery procedure. Inasmuch as the information subpoenaed is part of the record of crime stoppers, it is privileged. The trial judge's broad reading of this "privilege" is supported by the statutory language. (Emphasis in original)
State v. Gibson, 505 So.2d at 243.[3]
Here, the appellant's motion for disclosure did not ask the court to review the Crimestoppers records in camera for this impeachment information, which is the only relief permitted by La. R.S. 15:477.1. Instead, the appellant asked for full disclosure of this information, which is not discoverable. Thus, as per Cager the trial court did not err by denying this motion.
The appellant cites several cases where courts have held that it was reversible error for the trial court to curtail cross-examination concerning a witness' possible bias due to financial or other advantages in exchange for the witness' testimony. However, these cases are not applicable because none of them involves the disclosure of confidential information from Crimestopper records.
*575 Therefore, we find that the trial court did not err by denying Defendant Williams' request for the production of information concerning any payments made by Crimestoppers for tips given in connection with this case.

INSUFFICIENCY OF EVIDENCE
In his second argument, Defendant Williams contends that the evidence was insufficient to support his conviction for second-degree murder. He argues that the evidence merely showed that the shooting was the result of his anger at the victim, and as such the evidence at best shows that he was guilty of only manslaughter.
In State v. Brown, XXXX-XXXX, p. 22 (La.4/12/05), 907 So.2d 1, 18, the Court set forth the standard for determining a claim of insufficiency of evidence:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal, 00-0674, (La.6/29/01), 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
See also State v. Sykes, XXXX-XXXX, XXXX-XXXX (La.App. 4 Cir. 3/9/05), 900 So.2d 156.
The appellant was charged with and convicted of second degree murder, which is defined in pertinent part as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act." La. R.S. 14:10(1). Specific intent need not be proven as fact, but may be inferred from the circumstances and actions of the defendant State v. Hebert, XXXX-XXXX, p. 12 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041, 1050. Specific intent can be formed in an instant. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382.
Defendant Williams does not deny that he shot Mr. Mitchell, but he argues that the shooting was at most manslaughter. La. R.S. 14:31 defines manslaughter in part as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
This court in State v. Collor, 99-0175, p. 11 (La.App. 4 Cir. 4/26/00), 762 So.2d 96, 103 noted:
Thus, in reviewing defendant's claim that the evidence supports a manslaughter verdict, this Court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. State v. Sanders, 93-0001, pp. 18-19 (La.11/30/94), 648 So.2d 1272, 1287, cert. denied 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).
*576 In Collor, the victim told the defendant earlier on the day of the shooting not to return to the area. The defendant returned later to pick up his girlfriend, and at that point he was armed. The defendant admitted that the victim did not speak to him prior to the shooting, but rather the defendant merely opened fire upon perceiving that the victim gave him a "funny look." On appeal, the defendant argued that the evidence did not support his second-degree murder conviction because the shooting occurred in the heat of blood and in self-defense. This court rejected both of these arguments, finding that the jury could have reasonably found that the defendant's blood had had time to cool between the earlier threat and the defendant's return and subsequent shooting of the victim. This court also found that the evidence negated any claim of self-defense, and it affirmed the defendant's second-degree murder conviction.
In the present case, Defendant Williams argues that the evidence indicates that the shooting was a manslaughter in that it was the end result of an argument between himself and Mr. Mitchell, with Mr. Mitchell making it clear that he wished to "get at" him. However, a review of the testimony of Mr. Cardoza, Mr. Byrd, and Mr. Bannister shows that Defendant Williams and Mr. Mitchell were not engaged in any sort of heated argument at the time of the shooting. Mr. Bannister testified that Mr. Mitchell and Defendant Williams were "clowning around" at work on the day of the murder, and he saw no ill will between them at that time. Mr. Bannister stated that Mr. Mitchell was talking on his cell phone when Defendant Williams stopped the car in the middle of the street and asked Mr. Mitchell if he had something on his mind and if Mr. Mitchell wanted to "get at" him. Mr. Bannister testified that Mr. Mitchell did not respond, and Defendant Williams then pulled a gun. Mr. Bannister jumped out of the car, and he heard shooting as he walked away from the car. Mr. Byrd testified that there was some tension between the two men on the ride back to the Labor Ready office, and Defendant Williams stopped the car in the street and asked Mr. Mitchell if he still wanted to get at him. Mr. Mitchell replied yes and hung up his cell phone, and Defendant Williams got out of the car and started shooting. Mr. Cardoza testified that during the day Defendant Williams and Mr. Mitchell had argued, but nonetheless Mr. Mitchell accepted a ride back to the Labor Ready office with Defendant Williams. Mr. Cardoza testified that on the way Mr. Mitchell asked Defendant Williams about "Black and Milds," and Defendant Williams replied that he had just smoked one and that he only smoked one a day. According to Mr. Cardoza, Defendant Williams then asked Mr. Mitchell if he still wanted to get at him, and Mr. Mitchell replied affirmatively. Defendant Williams stopped the car, got out, and asked the same question a second and then a third time, shooting Mr. Mitchell after the third question.
Although one witness testified that there was some sort of argument between Defendant Williams and Mr. Mitchell earlier that day and another witness spoke of tension in the car, all three witnesses testified that Mr. Mitchell accepted a ride with Defendant Williams that afternoon. Two witnesses placed Mr. Mitchell on the cell phone at the time Defendant Williams challenged him prior to the shooting. All three witnesses testified that Defendant Williams initiated the incident in the car by challenging Mr. Mitchell. Thus, even if Defendant Williams and Mr. Mitchell had argued earlier in the day, the jury could have easily believed that the circumstances would have allowed Defendant Williams' blood to cool prior to entering the car with *577 Mr. Mitchell and the others and issuing Mr. Mitchell the challenge. Contrary to the Defendant Williams' argument, the jury could have thus found that mitigating circumstances, which would have reduced the killing to manslaughter, were not shown by a preponderance of the evidence and could have found him guilty as charged of second-degree murder.

DECREE
For the foregoing reasons, we affirm Defendant Williams' conviction and sentence.
AFFIRMED.
NOTES
[1] Writ den. XXXX-XXXX (La.4/8/05), 899 So.2d 2, cert. den. Divers v. Louisiana, ___ U.S. ___, 126 S.Ct. 431, 163 L.Ed.2d 327 (2005).
[2] Apparently, the defense learned the witness' identity through an intern's mistake, but defense counsel felt he could not interview the witness in light of the court's ruling on his motion for disclosure.
[3] The court further noted that any error would have been harmless due to testimony by a sheriff that a witness received $1000.00.