965 So.2d 479 (2007)
STATE of Louisiana
v.
Kentrell HARRELL.
No. 2007-KA-0202.
Court of Appeal of Louisiana, Fourth Circuit.
August 1, 2007.
Eddie J. Jordan, Jr., District Attorney of Orleans Parish, Alyson Graugnard, Assistant District Attorney of Orleans Parish, New Orleans, LA, for Plaintiff/Appellee.
Laura Pavy and Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS, JR.).
PATRICIA RIVET MURRAY, Judge.
This is a criminal case. The defendant, Kentrell Harrell, is the appellant. The principal issue Mr. Harrell raises is the sufficiency of the evidence to support his second-degree murder conviction. For the reasons that follow, we affirm.

STATEMENT OF THE CASE
On July 31, 2003, the State indicted Mr. Harrell for the second-degree murder of Caprice Anderson. On August 5, 2003, he was arraigned, and pled not guilty. On September 10, 2003, the court heard and denied Mr. Harrell's motions to suppress. On March 5, 2004, the trial court ruled that certain evidence was admissible as res gestae.[1] This matter was reset for trial *481 several times both before and after Hurricane Katrina struck the New Orleans area on August 29, 2005. On August 18, 2006, at the close of a three-day trial, a twelve-person jury found Mr. Harrell guilty as charged. On September 25, 2006, the trial court denied Mr. Harrell's motions for new trial and for post verdict judgment of acquittal, and sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence. This appeal followed.

STATEMENT OF THE FACTS
On June 8, 2003, at about 9:30 p.m., Ms. Anderson was shot and killed in front of her grandmother's house at 3110 ½ Lawrence Street in New Orleans. An autopsy was performed the next day by Dr. Gerald Liuzza, a forensic pathologist. The autopsy revealed that the cause of death was a single gunshot wound to the right side of the forehead. According to Dr. Liuzza, the presence of stippling surrounding the wound indicated that the shot was fired from a few inches away. During the autopsy, Dr. Liuzza retrieved a bullet from Ms. Anderson's body. Dr. Liuzza also found bruises on Ms. Anderson's legs, arm, and hip.
Although apparently no one witnessed the shooting, two of Ms. Anderson's relatives were at the scene within seconds: her uncle, Keith Harris, and her first cousin, Arieal Brewer.
Mr. Harris testified that he lived with his mother (Ms. Anderson's and Ms. Brewer's grandmother) at 3100 ½ Lawrence Street, which is the house in front of which Ms. Anderson was shot. Although Ms. Anderson did not live with Mr. Harris and his mother, she visited almost every day, as his mother watched Ms. Anderson's children. Mr. Harris testified that just before the shooting Ms. Anderson was talking on the telephone with his other niece, Ms. Brewer. According to Mr. Harris, after his nieces concluded their phone call, Ms. Brewer waited in the front room of the grandmother's house for Ms. Anderson, and he remained in the second room watching television. Mr. Harris then heard a shot.
In response to the shot, Mr. Harris testified that Ms. Brewer opened the front door, ran outside, and yelled to someone three times, "You killed my cousin." Mr. Harris, who has an amputated leg, then moved his wheelchair outside the house. Once outside, he saw Ms. Brewer "tussling" with Mr. Harrell, whom he identified as Ms. Anderson's boyfriend. He also saw Ms. Anderson lying on the ground. Mr. Harris threw himself out of his wheelchair and down the stairs, and he put his head on Ms. Anderson's chest. He saw Mr. Harrell appear to try to enter Ms. Anderson's car, which was parked in front of the grandmother's house, and then run from the scene. Mr. Harris stated that Mr. Harrell's "stepfather" arrived on the scene to check on Ms. Anderson, but Mr. Harris would not allow the "stepfather" near her.[2]
Ms. Brewer, who is Ms. Anderson's first cousin, testified that about a week before the shooting, Ms. Anderson showed her bruises that she said Mr. Harrell had inflicted on her. She stated that Ms. Anderson also told her that Mr. Harrell *482 had threatened to kill her. Ms. Brewer testified that the day before the shooting, Ms. Anderson had attended a birthday party for Mr. Harrell at his home, and during this party (which Ms. Brewer did not attend), Ms. Anderson and Mr. Harrell argued.
Ms. Brewer testified that on the morning of the shooting, she was at her grandmother's house at 3100 ½ Lawrence. She testified that she saw Ms. Anderson's car in front of Mr. Harrell's house, which is located down the block from her grandmother's house. Ms. Anderson was dropping off Mr. Harrell and some of his possessions. Later that day, Ms. Brewer testified that Ms. Anderson called her and asked her to accompany her to Mr. Harrell's house because she was intending to drop off a few more of his possessions, and she wanted Ms. Brewer with her in case Mr. Harrell became violent. Ms. Brewer testified that Ms. Anderson asked her to call Mr. Harrell's house, and when she did so the line was busy. She testified that Ms. Anderson then told her she was on her way to pick her up, and they ended the call. Ms. Brewer testified that she remained in the front room near the door, waiting for Ms. Anderson, and within thirty seconds she heard a gunshot.
In response to the shot, Ms. Brewer testified that she immediately exited the house and saw Ms. Anderson lying on the ground. Ms. Brewer went to her, and as she was kneeling over Ms. Anderson, she noticed Mr. Harrell standing nearby, looking around the area where Ms. Anderson was lying. She testified that she and Mr. Harrell fought, and she told him to leave. She testified that Mr. Harrell tried to open the door to Ms. Anderson's car, and then he fled from the scene.
Detective Ronald Ruiz, the lead homicide investigator on the case, testified that he arrived at the scene at about 10:10 p.m. When he arrived, he observed Ms. Anderson's body lying in the front yard. He identified several photographs of the scene, including one that showed Mr. Harrell's house, which, as noted, was located down the block from Ms. Anderson's grandmother's house. At the scene, Detective Ruiz spoke with two of Ms. Anderson's relatives, Mr. Harris and Ms. Brewer. They informed him that they were inside of the grandmother's house in front of which Ms. Anderson was shot. They further informed him that they heard a gunshot, exited the house, and saw Mr. Harrell on the scene. Neither Mr. Harris nor Ms. Brewer saw a gun in Mr. Harrell's possession.
Detective Ruiz's partner, Detective Anthony Pardo, assembled photographic lineups containing Mr. Harrell's picture.[3] Detective Pardo testified that he showed these lineups to Ms. Brewer and Mr. Harris, and they both chose Mr. Harrell's picture. These lineups were shown separately to Mr. Harris and Ms. Brewer. They both identified Mr. Harrell's photograph from the lineups. They also both gave formal tape-recorded statements.
Officer Michael Hamilton testified that he came to the crime scene to assist in crowd control. As he was leaving the scene, he received a description of the suspect. He also may have been given a name. A few blocks from the scene he spotted Mr. Harrell, who fit the description and whom he knew from previous encounters. Officer Hamilton detained Mr. Harrell, who identified himself, and transported him to the police station for *483 questioning. Although Officer Hamilton did not handcuff Mr. Harrell, he frisked him and found no weapons.[4]
Approximately two hours after the shooting, Detective Ruiz questioned Mr. Harrell at the police station and advised him of his rights. Mr. Harrell admitted that he and Ms. Anderson were romantically involved. Mr. Harrell, however, insisted that they had a good relationship. Denying any domestic violence, Mr. Harrell stated that he and Ms. Anderson would "play fight" and would give each other "love taps." Mr. Harrell stated that he was at home sleeping when he heard the gunshot and that he had just arrived at the scene when Ms. Brewer and Mr. Harris exited Ms. Anderson's grandmother's house. When Detective Ruiz questioned him as to how he arrived at the scene before the others if he was at home sleeping, Mr. Harrell replied: "You won't be able to prove I killed her because there are no witnesses." At that point, Mr. Harrell indicated he wanted an attorney, and the questioning stopped.
At the scene, the officers seized one spent nine-millimeter casing. From Ms. Anderson's car, which as noted was parked at the scene, the officers seized some shoes and men's clothing, as well as copies of a birth certificate and social security card in Mr. Harrell's name. The officers also seized the clothing Mr. Harrell was wearing when he was arrested.
Detective Ruiz obtained a search warrant for Mr. Harrell's house. Pursuant to this warrant, the officers seized nine-millimeter ammunition, a rifle, and some handguns. Detective Ruiz testified that the rifle was seized from the attic. However, he testified that he was unsure from which of the bedrooms the ammunition was seized. He admitted that he did not request that any of the ammunition be tested for fingerprints. Nor did he request that the casing seized from the scene be checked for fingerprints. He explained that he believed it was impractical to get fingerprints off of a fired casing. He also admitted that he did not request that Mr. Harrell's hands be tested for gunpowder residue. He explained that the test was very expensive and highly inconclusive.
Detective Ruiz further testified that soon after the murder the police received information that the person responsible for Ms. Anderson's murder could be found in a certain vehicle located on General DeGaulle Drive. He testified that officers stopped the vehicle and detained its occupants. Inside the vehicle the officers found two guns, but the caliber of neither gun was consistent with the nine-millimeter casing found on the scene. The officers thus released the occupants of the vehicle.
Detective Ruiz acknowledged on cross-examination that when he first questioned Mr. Harrell, he did not have a waiver of rights form available. He insisted, however, that any statements Mr. Harrell made occurred after he had been advised of his rights. Detective Ruiz testified that he did not tape his pre-interview with Mr. Harrell. He explained that he intended to tape record any formal statement. However, as noted above, the questioning ceased after Mr. Harrell stated he wanted an attorney.
Joseph Allen, an employee in the Clerk's Office property room, testified for the prosecution. Mr. Allen identified various documents listing evidence that had been seized in connection with this case. He *484 testified that this evidence was not available for trial because it had been stored in boxes on the floor of the property room and thus some of it was lost in the post-Hurricane Katrina flood. He clarified that some of the evidence had been lost in the flood, while other evidence might have been returned recently from remediation, but the returned evidence had not yet been sorted.
Officer Kenny Leary, an expert in firearms, firearms examination, and ballistics, also testified for the prosecution. Officer Leary testified that about two years after the shooting he tested the nine-millimeter bullet recovered during Ms. Anderson's autopsy and the nine-millimeter casing seized at the scene. He also received from Ray Miller, an investigator for the district attorney's office, the rifle that was seized from Mr. Harrell's residence.[5] Officer Leary testified that there was no match between the rifle and the casing and bullet. He testified that he did not test any other weapons in connection with this case.
Captain Stephen Gordon testified that he was the commander of the 911 communication center. He testified that information from 911 calls, regular calls to the police, and calls made by police officers were broadcast over the police radio. He identified a 911 report made in connection with this case, and stated that the time of the shooting was listed as 9:30 p.m. He also testified that at 9:37 p.m., information was received via the police radio concerning a suspect fleeing in a white Mitsubishi.
Darrell Lassere, who was the was the boyfriend of Mr. Harrell's mother, Karen, testified that he, Karen, Mr. Harrell, and Mr. Harrell's brother lived at 3115 Lawrence at the time Ms. Anderson was shot. The night before the shooting, he as well as Ms. Anderson attended the birthday party for Mr. Harrell at the house. On the night of the shooting, Mr. Lassere was lying in bed watching television when he heard a single gunshot. Moments later, he heard a woman shouting. He walked outside to the carport, looked toward 3100 Lawrence, and saw a woman running around outside. He also heard someone ask if anyone had called the police. Mr. Lassere walked back inside and called for Mr. Harrell, whom he saw walk out of one of the bedrooms. Mr. Lassere testified that he and Mr. Harrell then walked outside. Mr. Lassere remained at the carport while Mr. Harrell walked down the street. Mr. Lassere heard a woman scream to Mr. Harrell: "You did this." Mr. Harrell evaded the woman and walked towards Ms. Anderson's car, where he tried to open the car door. Mr. Harrell then ran back to his house, yelling for his mother. Mr. Lassere testified that as Mr. Harrell ran past him, Mr. Harrell stated: "They shot my old lady in the head."
Mr. Lassere, who is an emergency medical technician, grabbed his medical supply bag and ran to the scene, where he found Ms. Anderson lying on the ground. He also found Mr. Harris lying on the ground near Ms. Anderson. However, he did not see Ms. Brewer. Mr. Lassere testified that he checked Ms. Anderson and found no pulse. During this time, Mr. Lassere testified that Mr. Harrell remained in the area, pacing between his house and the murder scene. Mr. Lassere stated that Mr. Harrell told officers on the scene that he did not shoot Ms. Anderson and that he was at home when the shooting occurred. Mr. Lassere testified that Mr. Harrell was apprehended on the scene, in his mother's presence, approximately ten minutes after the shooting. Mr. Lassere stated that he *485 did not know who owned the guns that were seized from the Harrells' house.

DISCUSSION
A. Errors Patent/Assignment of Error III
By his third assignment of error, Mr. Harrell requests a review of the record for errors patent. Such review reveals there are none.
B. Remaining Assignments of Error

I.
In his first assignment of error, Mr. Harrell contends that the State did not present sufficient evidence to support his conviction. Specifically, he argues that there was no evidence to show that he was the person who shot Ms. Anderson.
In State v. Brown, 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18, the Louisiana Supreme Court set forth the following standard for determining a claim of insufficiency of evidence:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal, 00-0674, (La.6/29/01)[,] 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)).
Id.; see also State v. Sykes, 04-1199 (La. App. 4 Cir. 3/9/05), 900 So.2d 156.
Mr. Harrell was charged with and convicted of second degree murder, which is defined in pertinent part as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. Specific intent is defined by statute as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act." La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the defendant. Brown, supra; State v. Williams, 05-0459 (La.App. 4 Cir. 1/18/06), 925 So.2d 567, writ denied, 06-1029 (La.11/3/06), 940 So.2d 658; State v. Hebert, 00-1052 (La. App. 4 Cir. 4/11/01), 787 So.2d 1041. Specific intent can be formed in an instant. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382; Williams, supra.
Mr. Harrell argues that there was insufficient evidence to support his conviction because neither Ms. Brewer nor Mr. Harris saw who actually shot Ms. Anderson. He emphasizes that neither of them saw a gun in his possession despite that they saw him on the scene seconds after the shooting. He further emphasizes that Ms. Anderson did not make a dying declaration identifying him as the perpetrator. He still further emphasizes the broadcast of suspects in a Mitsubishi who were found to be in the possession of two guns, yet they were released.
*486 Neither Ms. Brewer nor Mr. Harris saw the actual shooting. Nonetheless, seconds after the shooting they went outside and saw Mr. Harrell, who appeared to be looking around Ms. Anderson's body for something.[6] While it is true that neither of them saw a gun in Mr. Harrell's possession, nothing prevented him from putting a gun in a pocket before they came outside. In addition, it is unclear if Ms. Anderson was in any condition to make a dying declaration, or if she was even alive, when Ms. Brewer and Mr. Harris reached her. As to the occupants of the Mitsubishi who were the object of the broadcast, Detective Ruiz testified that they were released when it was learned that the guns that were in the vehicle were not the same caliber as the spent casing found at the murder scene.
In addition to the testimony of Ms. Brewer and Mr. Harris placing Mr. Harrell on the scene seconds after the shooting, Detective Ruiz testified that Mr. Harrell stated to him: "You won't be able to prove I killed her because there are no witnesses." In addition, Ms. Brewer testified that Ms. Anderson told her that the bruises on her body were inflicted by Mr. Harrell, that Mr. Harrell threatened to kill her, and that just before the shooting Ms. Anderson told Ms. Brewer that she wanted Mr. Brewer to accompany her to Mr. Harrell's house, where she planned to drop off some of his possessions, because she feared Mr. Harrell.[7]
In his pro se brief, Mr. Harrell argues that Ms. Brewer's testimony shows that he was not on the scene until at least ten seconds after the shooting, thus corroborating Mr. Lassere's testimony that Mr. Harrell was at home when Ms. Anderson was shot. However, Ms. Brewer testified that she walked outside, saw the victim, and was on the ground next to the victim when she looked around and saw Mr. Harrell standing there. In order to support Mr. Harrell's assertion that he only arrived after the shooting, the jury would have had to believe that in less than ten seconds Mr. Lassere heard the shot and then the screaming, went outside, looked around, saw the commotion down the street, went back inside, called Mr. Harrell, spoke with him, and then walked back outside with Mr. Harrell, and then Mr. Harrell ran to the scene down the street from his house.
Mr. Harrell next argues that Ms. Brewer's and Mr. Lassere's testimony shows that he did not know about the shooting until after Mr. Lassere told him about it. However, only Mr. Lassere so testified; Ms. Brewer's testimony placed Mr. Harrell on the scene within ten seconds of the shooting, but was silent as to how he learned about the shooting. Mr. Harrell points to Mr. Harris's testimony to corroborate Mr. Lassere's testimony. The only corroboration, however, concerned Mr. Lassere (who Mr. Harris identified as Mr. Harrell's "stepfather") coming on the *487 scene after the shooting to try to help Ms. Anderson.
Mr. Harrell attacks the jury's finding of his specific intent to kill or to cause great bodily harm. He points to Mr. Lassere's testimony that after learning about the shooting, Mr. Harrell returned to his house looking for his mother and Mr. Lassere in order to get the victim medical treatment. Again, only Mr. Lassere so testified; Ms. Brewer and Mr. Harris merely testified that Mr. Harrell fled, and Mr. Harris testified that Mr. Harrell's "stepfather" (Mr. Lassere) came to tend to Ms. Anderson. Additionally, only Mr. Lassere testified that Mr. Harrell remained on the scene or at his nearby house until he was arrested. As noted, Officer Hamilton testified that Mr. Harrell was arrested at another location a few blocks from the scene.
In sum, the State established the requisite specific intent to kill or to inflict great bodily harm through Ms. Brewer's testimony concerning Ms. Anderson's statements that Mr. Harrell inflicted the bruises on her body, that Mr. Harrell threatened to kill her, and that she wanted Ms. Brewer to accompany her to Mr. Harrell's house when she returned his possessions because she feared him.
Lastly, Mr. Harrell points to the broadcast about the vehicle containing the perpetrators. He notes that the tip provided a very detailed description of the vehicle, and only someone who actually saw the shooting would have been able to give such a detailed description. However, Detective Ruiz testified that although two guns were found in the vehicle, neither gun was of the same caliber as the spent casing found on the scene.
Although Mr. Lassere's testimony contradicted the testimony of Ms. Brewer and Mr. Harris on several points, the jury apparently chose to believe Ms. Brewer and Mr. Harris. This court has repeatedly held that a factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 00-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La. App. 4 Cir. 5/31/00), 765 So.2d 432. Such is not the case here.
Given the circumstances of the instant case, ample evidence was presented for the jury to find beyond a reasonable doubt that Mr. Harrell shot Ms. Anderson and specifically intended either to kill her or to inflict great bodily harm upon her. This assignment is without merit.

II.
By his second assignment of error, Mr. Harrell contends that he was deprived the right to a fair trial by "repeated, improper, references to his post-arrest silence and his silence at trial such that a mistrial should have been declared." Mr. Harrell acknowledges that defense counsel made no objections to this testimony and that defense counsel did not request a mistrial. He insists, however, that the error in referring to his invocation of his right to silence was so significant that the trial court should have declared a mistrial on its own.
A reading of the trial transcript shows that not only did defense not object to any reference to Mr. Harrell's invocation of his right to silence, but also that many of the references were elicited by defense counsel on cross-examination.
Detective Ruiz stated during his direct examination that he advised Mr. Harrell of his rights and asked him if he wanted to make a statement, and Mr. Harrell said he did not. There was no objection to this statement, and any error in this statement cannot now be raised on appeal. See La. C.Cr.P. art. 841; State v. Lee, 02-1793 *488 (La.App. 4 Cir. 4/2/03), 844 So.2d 970; State v. Young, 02-1280 (La.App. 4 Cir. 1/22/03), 839 So.2d 186. As noted by this court, "[t]he contemporaneous objection rule exists, not only so that a trial judge may correct the error at the time it is made, but it also serves notice in the record that the complained of conduct was so noticeable as to create prejudice in the minds of the jurors." State v. Taylor, 91-2496, p. 5 (La.App. 4 Cir. 3/29/94), 635 So.2d 416, 420.
Moreover, Mr. Harrell at first appeared to agree to speak with Detective Ruiz. Mr. Harrell did not tell Detective Ruiz he wanted a lawyer until after Detective Ruiz asked how he could have gotten to the scene before Ms. Brewer and Mr. Harris if he had been sleeping at his house down the street, and Mr. Harrell replied that the police would not be able to prove he killed Ms. Anderson because there were no witnesses. Once Mr. Harrell invoked his right to counsel, all questioning stopped. On cross-examination, defense counsel questioned Detective Ruiz about Mr. Harrell's invocation of his right to silence. Later during cross-examination, defense counsel questioned Detective Ruiz about the lack of an audiotape of his pre-interview with Mr. Harrell, and Detective Ruiz responded that he would have made a tape recording if Mr. Harrell had agreed to give a formal statement. Mr. Harrell, however, refused to give a taped statement after he made the comment about the police being unable to prove he killed Ms. Anderson.
In sum, there was no objection to Detective Ruiz's initial statement concerning Mr. Harrell's refusal to give a statement. Indeed, Mr. Harrell apparently initially agreed to give a statement and then invoked his rights to counsel and to silence. Defense counsel elicited the other references to Mr. Harrell's refusal to give a statement. Neither a contemporaneous objection nor a motion for mistrial was made in connection with these statements. Therefore, if indeed there was any error in admitting this testimony, Mr. Harrell is not entitled to any relief.
Mr. Harrell also points to a statement made by Detective Ruiz that he insists was a reference to his right not to testify. During cross-examination, Detective Ruiz was describing the time frame of the events, and he stated regarding Mr. Harrell: "No one knows where he went to; only Mr. Harrell can answer that question." Mr. Harrell acknowledges that neither an objection nor a motion for mistrial was made in connection with this statement. Citing La.C.Cr.P. art. 770, he nonetheless contends that the error was so egregious that the court should have declared a mistrial on its own motion. Mr. Harrell cites no authority for his assertion that the trial court was obligated to declare a mistrial on its own motion. Indeed, the statement here does not fall within the provisions of Article 770. Although the statement was arguably a comment on Mr. Harrell's refusal to testify, which is specified in Article 770, it was not made or solicited by the judge, district attorney, or a court official. Therefore, the provisions of Article 770 do not apply. Instead, the admonition provisions of La. C.Cr.P. art. 771 would apply. Article 771 provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, *489 or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
In this case, Detective Ruiz's comment would arguably fall within the scope of Article 771. Defense counsel thus could have asked the court for an admonition, and the court could have declared a mistrial if it found that an admonition was insufficient to cure any harm caused by the comment. However, not only did defense counsel not object to the statement, but also defense counsel failed to request even an admonition, let alone a mistrial. As such, the trial court did not err by failing on its own motion to grant a mistrial. Mr. Harrell cites no authority to support his assertion that the court should have done so. This assignment is without merit.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Mr. Harrell's writ applications from that decision were denied. State v. Harrell, unpub., 04-0394 (La.App. 4 Cir. 3/8/04), writ denied, 04-0791 (La.3/31/04), 869 So.2d 863.
[2] The man Mr. Harris identified as Mr. Harrell's stepfather is Darrell Lassere. At the time of the shooting, Mr. Lassere, who is an emergency medical technician, was the boy-friend of Mr. Harrell's mother. He was living with Mr. Harrell's family in a house located down the street from Ms. Anderson's grand-mother's house.
[3] After being shown the police report, Detective Pardo, who testified for the defense, acknowledged that he received Mr. Harrell's name as a suspect from Detective Schultz, not Detective Ruiz.
[4] Officer Hamilton denied apprehending Mr. Harrell in front of Mr. Harrell's house or telling Mr. Harrell's mother that he was taking Mr. Harrell away to keep him safe. Officer Hamilton also denied seeing Mr. Harrell on the crime scene.
[5] Mr. Allen testified that before the hurricane someone named "R. Miller" had checked out the rifle, but the rifle had not been returned. The rifle thus was not lost in the flood.
[6] The prosecutor speculated during closing argument that Mr. Harrell was looking for the spent casing. It is unclear where on the scene the police found the casing.
[7] Before trial, a motion in limine was filed by the State seeking a determination as to the admissibility of Ms. Brewer's testimony regarding her conversations with Ms. Anderson shortly before the shooting. The trial court found the evidence admissible as res gestae. As noted elsewhere, Mr. Harrell's writ applications from this ruling were denied. At trial, defense counsel preserved Mr. Harrell's hearsay objection to this testimony by making an objection to this line of testimony. Neither Mr. Harrell's appellate counsel nor Mr. Harrell in his pro se briefs assigned the trial court's overruling of that objection as error. We are thus precluded from addressing this evidentiary issue on appeal.